and so we'll begin with that one. Mr. White, it takes four of them to match one of you. What do you think of that? That's a testament to you even before we start. Thank you, Your Honor. I hope I rewarded your faith in me. All right. You have reserved, I think, three minutes for rebuttal. Is that right? Yes, that's correct. So that gives you seven minutes now to begin. So the floor is yours. Thank you. Good morning, Your Honors. May it please the Court, my name is Brendan White. I represent the appellant, William Jones, in this appeal. There's a lot of overlap in the issues in this case, so I apologize if there's some jumping back and forth between the issues. I just want to start by pointing out in the brief, the government states that there's no evidence that Castillo shot Mr. de la Cruz. In fact, Mr. Castillo had stated and admitted to having stated that he did shoot de la Cruz. He admitted it to Chico Siete, a close criminal confederate of his, a loyalist of his. Was there a recording of it or a testimony? Pardon me? Was that by recording? That was his testimony. Whose testimony? The chief cooperating witness, Castillo, yes. I guess, I mean, I understand the point, but I'm not sure why it matters, right? We're supposed to draw all inferences in favor of the government on the conviction. And so there are two eyewitnesses who said that Mr. Jones shot Mr. de la Cruz, right? That is correct, of course. So why isn't that the end of the story, that you could draw all inferences in that direction? That is where we jump over to the second issue, Your Honor, that Castillo's testimony was, of course, critical to the conviction here. Well, there's another witness who says the same thing, right? And then your client also sort of took credit for the murder afterwards, according to a witness, right? That is true. But these are witnesses who had tremendous amount of self-interest, Castillo in particular, who was the logical, natural, and most obvious suspect of having shot de la Cruz. They were close criminal confederates throughout. They were good friends. They committed crimes together frequently. Even assuming the existence of the Trinitarios, assuming the interest, the existence of 3MB, assuming that some of these people were involved in these organizations in one way or another, there's plenty of evidence coming from Castillo's own mouth and independent evidence that he and de la Cruz worked together frequently, committing crimes together, on things that had absolutely nothing to do with Trinitarios, including a Dominican bail scheme, including a scheme in which Castillo was stealing things from UPS and reselling them. And he was privy to a lot of confidence or, you know, to the extent that these people believed in the idea of confidentiality at all. He was the closest confidante of de la Cruz and came to learn before anyone else and to a greater extent than anyone else that de la Cruz was in fact cooperating with an NYPD detective and that detective was helping him get out of criminal mischief.  The points that you're making, I mean, certainly they're plausible and reasonable and a jury could choose to accept them and acquit or a jury could reject them, which is what happened here. So what is the extra, what is the thing here that gets you over the hurdle that we are supposed to be viewing the evidence in the light of that, in the light most favorable to the government? Yes, and I realize, of course, I've been giving you a fair amount of background, but ultimately Castillo's credibility was at the core of this case for the reasons I've stated. He had to be able to convince the jury, as a witness who was heavily self-interested, he had to be able to convince the jury that he was not responsible for this, that in fact it was Mr. Jones who had ordered it and had committed this murder himself. And the evidence showed that Castillo was present at the scene. It showed that he had driven there in addition to all the motive-related evidence. So he had to be able to show that this was actually Mr. Jones, not only his idea, but that he had done it. Why is that what the jury is supposed to figure out? The questions you're asking, why? Wasn't that before the jury? It was, but they didn't get the whole story. Because the truth of the matter is that Castillo was covering up the fact that he had... Let me re-step on that. But tell me, who was supposed to supply the rest of the story? The rest of the story should have been supplied by Agent Jesselson, who would have been able to show that Castillo got arrested in January, began cooperating, and months and months later, right before trial, when maybe it becomes clear that this case isn't as obvious as everybody thought it might have been, that he needs to show that this was a plan and an order that had been given by Mr. Jones, and that Mr. Jones knew about this all along. And I'm going to jump forward a little bit. Yes, there was a juice bottle found that contained Mr. Jones's DNA, but that juice bottle contained overwhelmingly DNA evidence connected to Mr. Delacruz, the victim. He was there. Obviously, there's no question about that. But Mr. Jones was shown in the Bronx. A very reasonable inference is that they left Mr. Jones in the Bronx talking about anything. Yeah, this guy needs to be taught a lesson. Set this guy straight. He's important to us and he can't be talking to the police. Nothing about a murder, however. So it became absolutely crucial to point out that this is something that Mr. Jones had been talking about for a long time. And what do you know? That was only added in the month leading up to trial, when people start getting really down to brass tacks and saying, okay, here are some of the potential vulnerabilities in the prosecution. And Castillo said, well, I'll give you that. Here's what really happened. I know I never mentioned that before, but now that we're here. Yes, he told me months ago, let's plan a murder. That was crucial to his credibility. It was crucial to the prosecution's theory of the case. And just getting into the legal requirements of Rule 613 quickly, because I see I'm running out of time. The context in which this came up, it became obvious that defense counsel was asking about, didn't you, isn't it true that you only made this statement at this time, right before trial, temporally, you know, very close to the beginning of trial and not at the beginning of your cooperation? It wasn't, you know, were you telling the truth the whole time? It was, you had a chance to say this and you didn't. One would think that would have been crucial to the prosecution that right from the beginning, Mr. Jones had planned and ordered this. It came at a much later time. And for the reasons I discussed with respect to Mr. Castillo's credibility, yes, that could have made a difference. Especially, I'll just add quickly, the government argues that this was, at least in theory, an aiding and abetting case. Let's just say the evidence, let's just say the jury didn't believe Mr. Castillo's, you know, what I deem to be implausible testimony that he was running away and just looked back out of his peripheral vision and happened to see Mr. Jones shooting Dela Cruz. You know, I'd submit that that defies the law of physics. But putting that aside, let's just say the jury didn't believe that. But they did believe that, well, even if Castillo did the shooting, it was on Jones's order. That would make a big difference, knowing that in fact, oh, that's only something he added at the last minute. And for those reasons, Your Honor, unless you have any other questions, I've reserved time for rebuttal. All right. Okay. You have three minutes for rebuttal. So we'll have here from the government. Thank you. Ms. Johnson. I see you have a lot of support. I do. Good morning, and may it please the Court. My name is Emily Johnson. I represent the United States on this appeal, as I did in the district court below. I'd like to start where my colleague left off, discussing Judge Ramos' evidentiary ruling related to the testimony of Albert Castillo. It was not an abuse of discretion for Judge Ramos to preclude Detective Jesselson from testifying and offering extrinsic evidence about Castillo's proffer statements. Judge Ramos presided over the trial, observed Mr. Castillo testify for multiple days, and he was in the best position to conduct the fact-specific inquiry about whether there was, in fact, a prior inconsistent statement for which extrinsic evidence could be admitted, and whether doing so would violate 403. And in any event. And therefore. And even if there was a prior inconsistent statement, whether offering the extrinsic evidence would otherwise be inadmissible under 403. And even if it was error, which the government does not concede, that error was almost certainly harmless. The single most important factor in the harmlessness inquiry is the strength of the evidence. As Judge Ramos stated at Jones' sentencing, this case was, quote, extraordinarily strong. The government's evidence involved two cooperating witnesses who testified that Jones murdered Frederick Dela Cruz. But one of them is Castillo, right? Correct. One of them is Castillo, but the other one, a jury could have credited Mr. Rivera's testimony on that point, even if they did not credit Mr. Castillo. And that would be sufficient, drawing all inferences in favor of the government, to support the conviction. In addition, counsel, this error was not harmless, if it even was error, because counsel was afforded. It is harmless.  Thank you, Judge. So you're telling me of the overwhelming strength of the case. You have two eyewitnesses, one of whom is Castillo, and one of whom is Rivera. Correct. And then what else you got? There was significant physical evidence at the crime scene that corroborated the cooperator's account of what happened, including the ballistics evidence at the crime scene that showed that a .45-caliber firearm was used in the murder. Both Jones and Castillo testified that—I'm sorry, both Rivera and Castillo testified that Jones had a .45-caliber firearm on him that evening. There was also video and DNA evidence that corroborated both Castillo and Rivera's accounts of the evening of the murder. And in addition, there was a significant amount of social media and phone evidence showing Jones' intent and planning of the murder. Regarding Mr. Castillo, defense counsel engaged in significant cross-examination over two days of Mr. Castillo, and the evidence that Judge Ramos excluded extrinsic evidence of related to planning of the murder. There was at least four other statements in the record by Jones and Rivera related to—I mean, sorry, by Castillo and Rivera related to Jones planning the murder. So this was, in addition, completely cumulative evidence. Was there other evidence of Castillo saying he was present at the planning meeting, where they had scouted out the location? There was no other evidence for that particular incident in Yonkers, where Castillo testified that they were in Yonkers doing surveillance for another operation of the gang. And during that surveillance, Jones told him this would be a good place to kill Dela Cruz. So it's not really cumulative of just evidence that indicates that Jones made statements about planning this or that type of thing? That particular incident, but there's other incidents in the record that Castillo testified about, where Jones told him he would take care of it, meaning Frederick Dela Cruz, after his cooperation became known to the Trinitarians. In a separate conversation, Jones told Mr. Castillo he would get it done quickly. And Mr. Rivera also testified to at least two instances where Jones told Rivera that something had to be done about Frederick Castillo and that he was planning to kill him. So unless the Court has other questions, I rest on the submission and ask that the judgment of conviction be affirmed. All right. Thank you very much, Ms. Johnson. Mr. White, back to you for three minutes of rebuttal. Thank you, Your Honors. Just touching on what my adversary raised towards the end there, the evidence of Mr. Jones having stated, I will take care of it, Castillo himself acknowledged that he did not actually — and this is earlier on, you know, during some of his — as I understand it, and, you know, I'm willing to be corrected, of course, if I'm wrong about this. But as I understand it, in some of the earlier processions, he said his understanding was he would be punished according to the rules of the Trinitarios, not that take care of this means he will be killed. So that's a big difference between that and this would be a good place to kill de la Cruz. Can I just ask you, I mean, I understand your argument that the questioning, maybe in front of the jury, maybe didn't pull out the distinction you're making about the fact that this was the first time he's mentioning — Castillo was mentioning that he's there at the planning meeting and, you know, the idea that his statement, I told him everything from the beginning is maybe not entirely accurate or it's misleading or what have you. But I guess I'm just wondering, what impact on a jury would that have had? Had they realized or had they come away with the impression of Castillo said all of these things and, oh, you know, at the first proffer he didn't mention that he was at the planning meeting? What is the weight of that? How is that error, if it's an error, not harmless? Well, first, just going to the question of the overwhelming weight of the evidence, which obviously we dispute. You know, Castillo, as I'm sure your honors recognize, was a cooperating witness, facing suspicion for having committed that murder himself. Rivera also facing very serious time. Both of them had strong motivations to lie, to implicate somebody else to help themselves. That much is obvious. The fact that Mr. I believe Judge Ramos placed a heavy amount of reliance on the existence of the juice bottle. But I, with all due respect to Judge Ramos, I think he missed the fact that the DNA evidence showed that it was clearly in the possession of De La Cruz. There was a videotape shown of Mr. Jones in the Bronx, not on Long Island, earlier in the night, having sipped from the same juice bottle. So that does not prove Mr. Jones's presence there. Getting to Mr. Castillo's credibility, his overall credibility, yes, I concede, sure, he was close examined fairly intensely. However, he was a very manipulative person. He admitted on the stand, ultimately, that he was aware of De La Cruz's not only being a cooperator, not only being a risk of, you know, turning on everybody, but turning on himself in particular. And he pretended, he put on an act when Jones said, oh my God, you know, do you believe this? Look what this guy said. And he's like, oh, you know, Castillo acted as though he was startled by that, completely aware that he knew about that video. This was somebody who knew how to play Mr. Jones. That was his plan. The idea that Mr. Jones had said, well, why don't you admit to this murder? You know, keep me out of it. Castillo was not some patsy here. He was a high-ranking member. I guess the problem is, I mean, you wanted to call the detective to testify that he didn't, that Castillo did not say anything about this planning meeting in Yonkers at the first proffer. But Castillo didn't insist that he had said that at the first proffer, right? All he said is that I was truthful from when I started. I wasn't lying to the government. And so it's not a direct contradiction. He was directly asked a specific question about a specific statement made at a specific time, and his response was I told them everything from the beginning. That logic and common sense, that's what he was addressing. That was clearly the intent of the question. It was meant to say you did not say that in January. He said that he was truthful from the moment that he started speaking with the government. I mean, so that doesn't mean that you gave the full story with all details the first time you sat down. It just means you didn't make false statements the first time you sat down. Our position, respectfully, Your Honor, is no. That is a specific statement about a specific question about a specific statement that he claimed to have made. But I don't think that's what his statement said. I mean, maybe the cross could have followed up and asked more pointedly or gotten a specific answer to that question. But instead he gave a general answer to the question, and it seems to me the extrinsic evidence is not going to add much to this. It would have showed, and obviously I assume that Agent Jesselson would have testified that that's correct. It was only at the very end. That was the inquiry, and it was important for the reasons I've pointed out to Your Honors. His credibility, not merely his general credibility, but his credibility about this murder, the one that he was trying to pin on Mr. Jones. All right. Well, we will reserve decision. We've gone over it a little bit, but thank you for your arguments, both of you. Thank you, Your Honors.